and Ms. Hayes is here for the appellate and Mr. Kobrinski is here for the appellee. Counsel, you may begin. May it please the court I'm Anne Hayes and I am representing the appellant Patrick Jacques in this case. We're just dealing with the conviction issues and not the sentencing issues. That's correct. We've withdrawn our sentencing issue in the case. Patrick Jacques was convicted of possessing with intent to distribute small quantities of marijuana and crack cocaine that were contained in a sandwich bag that was concealed in a closed compartment in the trunk of his girlfriend's car. He was a passenger. He was also convicted of possessing a firearm in furtherance of the charged gun offense. The evidence was insufficient to support as to both crimes because the government did not prove that Mr. Jacques knew that the recorded interview that was played for the jury and that interview reflected that he admitted that he placed the gun in the back of the car. He admitted that he previously sold drugs. He admitted that he knew that there was marijuana in there. So that pretty much resolves the sufficiency of the evidence claim, isn't it? Since he put the gun there, he obviously knew that the drugs were back there too. I disagree, Your Honor. First of all, he did not challenge his conviction for possessing the gun as a convicted felon because evidence did show that he acknowledged placing the gun in the car. And there was some suggestion that he had dealt drugs in the past, but he said that he was not selling marijuana at that point in time. He said that repeatedly during his argument, during his statement, at least twice. And the drugs were found separately from the gun. This was in the trunk of a Toyota. There were drugs and the gun in the trunk of the car. He put the gun in the trunk of the car. Yes, sir. Why couldn't the jury infer that if he put the gun in the trunk of the car and there were drugs in the trunk of the car that he knew there were drugs in the trunk of the car? Because they were located separately, Your Honor. I would analogize to a circumstance where the girlfriend perhaps would give him a drawer in her house to store his hide something in that drawer. He wouldn't be assumed to have knowledge that she had hidden something herself in her own drawer. It's the same circumstance here, Your Honor. In this case, didn't he also admit that there was, quote, a bomb in the trunk? And then he estimated that it was worth about 175. And based on the evidence that was offered by the government, the detective who testified said that when packaged in $5 bags, there being 37 of them, it would be worth about 185. So he knew that there was the marijuana in the back, and he knew the approximate worth of it, and he admitted to selling it and having done so for a long time. Why wouldn't that be sufficient for a reasonable jury to be able to find him guilty? That's a big question, and I'm going to have to separate that out into some pieces, Your Honor. Regarding the bomb, Mr. Jacques did not admit that there was a bomb in the car. He said if there were a bomb. He wasn't able to finish that sentence, but it's pretty clear that he was heading toward if there were a bomb, I didn't know about it and it wasn't mine. That's the most realistic reading of that statement. So the government said, well, but he mentioned a bomb, so clearly he knew there was a bomb in the car. He made that statement after the government had already told him at least twice during this interview that they had taken marijuana from the car. They mentioned that they had taken bags of marijuana from the car. They mentioned that they had taken a quantity of marijuana from the car. He knew what he was accused of at this point. He knew that they thought that he had taken a bag of marijuana out of the car. So it didn't take any prior knowledge on his part to know that was the accusation, and he was denying that he had put that bomb in the car. Regarding the 175, I think it's really important to note that in the transcript that the agents provided, the police officers provided of the interrogation, the reference to 175, it looks very different than it did in the trial transcript. And this transcript was provided by the officers who were there and who were present. So while the trial In the transcript, it reads like this. It says, I don't, I don't, I think I have at least like 100 comma 75 weed. And that is very different. That sounds like it's an or. And what's very important is in the same sense, if you'll indulge me, I'm just going to read a short portion of this transcript. And understand the jury had to listen to hours and hours of this recording, and it was very difficult. But here's what he says. Agent Meehan asks him, and how much weed was it? Was it in like a bag? Because he said that he had some in a pipe and in his ashtray. And he said, I don't, I don't, I think, I think I have at least 175 weed. They asked him, did you keep it in little bags? Is it, how did you do it? Is it in one big bag? These are two agents talking over each other and trying to elicit this information. He says, I don't know, I don't know, I don't know. They say, you don't know. He says, since I left it, when the guy fighting the fight, when the men fight, hmm, that's when I lost my weed. Oh, you see, I have like weed. And then them boys, and when they wait for a mama, come they take the car. See, I keep telling you, probably, I use mine. I know at five. So in the very same statement that the government's relying on to say there was a hundred seventy-five dollars worth of weed, he's saying there was a hundred or seventy-five. Didn't Officer Felipe testify at the trial that a hundred and seventy-five weed means a hundred seventy-five dollars worth of marijuana? He did, Your Honor. Okay. He did, but based on, Officer Felipe had to be, based on his status in the trial, his job, the explanation the government gave for allowing him to do interpretive testimony about what happened at this event, this interrogation, was supposed to be based on what he learned in this interrogation. This is the best source of what he learned in the interrogation. Well, that's, I mean, these are good arguments to be made for the jury, but the jury is entitled to infer what he meant by a hundred and seventy-five weed after listening to his recorded testimony. Yes, Your Honor, and yet it must be substantial evidence, and in this same, just a minute of saying a hundred seventy-five weed, and he says he lost it. It's hard. I know that, I know that a jury is entitled to credit some testimony and discredit other testimony by a witness, but this is part and parcel. It's just, in this instance, it can't be substantial evidence where you have to throw away something that's part of the very same incident. You want to tell us something about the other issues, the adverse inference, jury instruction, and Yes, Your Honor, let me, let me tell you, well, the prosecutor's remarks, that's a quick thing to address. I mean, the prosecutor, in closing arguments, said, it was explaining how they got this, what was happening during the interrogation. The prosecutor said, because ultimately the police arrest criminals, and so they're trying to find criminals, and one of them that day was Mr. Jacques. It's an objection. So we review that issue for plain error? You do, and you also review it as part of cumulative error. So, although on its own, you may find that it doesn't rise to the level of prejudice, when you put it together with the other problems, with the failure to give the adverse inference instruction, and with the allowing the agent to give interpretive testimony about the post-arrest statement, it rises to the level where a new, where the trial was unfair, and a new trial is required. Regarding the adverse inference instruction, it's undisputed in this case, undisputed that the government destroyed evidence that was taken at the time of Mr. Jacques' arrest, and most important, it included gunshot residue evidence, and it included DNA evidence. Most importantly, the gunshot residue. There were two sources of evidence, two pieces of evidence. Why does it matter? And let me tell you why I'm thinking that. He admitted, and I think you conceded that he admitted, that he possessed the gun. So why does it matter whether he shot the gun or not? I mean, if he's admitting that he possessed the gun. During the trial, to the jury, he didn't admit that fact. In the Rule 29 argument, the government said, you know, we acknowledge there's enough evidence as the case exists that we're not going to fight it. But he didn't admit to the jury that he possessed the gun. Right, but he admitted it in his statement to the police. He did, but Your Honor, there are, again, the transcript of that statement is so confusing that the jury could have disregarded it had there not been other evidence to show that he could link it to that gun. And in this case, that evidence was an out-of-court declarant who said he had shot a gun at her. And if you were able to discredit that testimony, it would greatly undermine any evidence of his gun possession. So it was prejudicial, Your Honor. Ms. Hayes, you've asked for this instruction, but what did the jury have before it, or did the judge have before him, as to the intentional destruction of this evidence, as opposed to it got lost somewhere? Oh, well, Your Honor, there actually was a trial. This was litigated before trial in a post, in a trial memorandum and a response to a trial memorandum, where the government acknowledged that this evidence was sent. It was in the physical possession of the City of Miami Police. It was sent to a warehouse, it was targeted for destruction, and it was destroyed by the City of Miami Police. But that wasn't done in an evidence that that happened. Nevertheless, it was definitely an intentional act, and it was of evidence that certainly was where, and let me get get the right language for you, it was evidence that, you know, the government surely appreciated the significance of the evidence in this case. And I understand that under Beshear v. Amtrak, in a civil case, the court has said that there must be a showing of bad faith to warrant a spoliation argument. And yet this court has acknowledged that bad faith does not require showing of malice. That's in the Mann v. Taser case. And that . . . That's a civil case, all right? We never said that in the criminal context. That's correct, Your Honor. And if I might just take a moment, I want to mention that in a criminal context, it's all the more powerful . . . But let me ask you this, and I'm sorry to interrupt, but excuse me. Even assuming that you didn't have to show malice, okay? Sure. How is the defense substantially impaired by not being able to have this instruction? Since there was cross-examination on it, it was argued to the jury. I mean, how is the defense substantially impaired, particularly in the fact that he conceded that he had the gun? If I might take a moment, Your Honor, to answer that. He did make the argument in closing argument. Certainly he did, but argument by counsel does not have the power and the gravitas of an instruction by the judge saying you can consider the evidence in this manner. The judge never told the jury that, and that makes a tremendous difference. And again, the fact that he made that admission, it's not unusual in a trial for someone to have made an admission in an out-of-court statement and then deny it at a trial that the fact admitted actually occurred. Thank you, Your Honors. Thank you, Ms. Kabrinsky. Oh, I'm sorry, Ms. Hayes. Mr. Kabrinsky will now argue for the government. Thank you, Your Honor. May it please the court. I'm with me at the counsel table. I'm the trial AUSA in this case, and my co-counsel is with me, Ilham Hosseini, also an AUSA. I'm the one who's the subject of the improper closing remark, though, so that should be clear. I'd like to actually start where we just ended, if possible. Well, it was an improper remark, wasn't it? Your Honor, I disagree. I think right in context. He must be guilty, ladies and gentlemen of the jury, because police don't arrest guilty people. You knew that was an improper remark, and I would agree with that. How I framed it, and if you go to the context of this statement, and earlier in the closing I said we don't know everything that happened on September 24th, 2014, and the defense through cross-examination of several witnesses and also in the opening statement said you should disregard. They made the same arguments that Ms. Hayes is making now to the jury about disregarding the confession, and I was trying to explain one of the reasons that the confession, the statement took 90 minutes, was that police arrest criminals, and perhaps it was inartful. I should have said investigate crimes, but I was referring to the individual Jocks was pointing the finger to. I wasn't referring to Mr. Jocks. I was referring to Mr. Peterson. But here's the problem with that, and I think what you said was, and I submit to you ladies and gentlemen, the defendant in most of the talking, and they kept asking him until they could try to understand what it is that he was articulating, and a lot of the statement was in fact given credence to his version of events, because ultimately the police arrest criminals. Now, maybe that could be construed in a way that you didn't intend to necessarily malign Mr. Jock, and the way I would construe that would be that they were looking to find out whether a crime had occurred or not, but I don't think you can, because the next sentence that came after that was, and so they're trying to find criminals, and one of them that day was Mr. Jock. I mean, you said Mr. Jock was a criminal, and I mean. Your Honor, I agree it was inartful. I disagree that it's improper. Well, let me let me ask it to you this way. I mean, I think it seems to me that it's improper. You may not have intended it that way, but I think it can easily be understood that way, and you know, I don't, in reading the whole thing, I don't necessarily think you intended it that way, but that's not the test, so let's just assume for purposes of this argument that at least one of us is going to find that it is an improper remark. Do you want to address how we should handle that? Yes, Your Honor, but before we get there, I would just like to cite the court to Blakey, where there were three arguments that were determined to be objectionable. There were objections at the time, and one of them was that he was a professional, professional criminal, and that the record didn't bear that out, and so the suggestion is that in Blakey, he only had one prior credit card fraud conviction, which wasn't before the jury. Well, here, Mr. Jock's status as a felon was actually a necessary element, and he was a criminal, but that he stipulated still needed to be because it was still an element the jury had to find, but again, I didn't say he was a professional criminal. I didn't say, I didn't refer, even though he's a career offender, I didn't refer to that. I said that day he was a criminal, but that, and I think that goes to the Your Honor's point, which is that even if it was improper, which again, I argue it wasn't, assuming it was, it still was fleeting, and it also wasn't something that substantially impaired the, or permeated the entire atmosphere of the trial, because the fact is that the issue of his felony conviction was already before the court. Well, I mean, that's the standard, you know, it's got to be harmless, but I mean, if we keep applying that standard, what incentive is there for a prosecutor not to make these improper and prejudicial remarks at closing argument if you always know that we're going to apply that standard on a, on a, on review? Your Honor, I think if you read, I understand the premise of it, and I don't think it's misplaced except for, if you read the context of the overall closing statement, where I was not arguing based on his character to convict him, that I was explaining that Peterson could possibly be a bad guy, but Mr. Jock still found himself in a situation where he, because of a chain of events that led to a proper police stop, he was caught with a gun and he was caught with the drugs, and so the, the, there, I wasn't trying to toe the line, I wasn't trying to approach the line, I was making an inartful transition from the, and also explaining why it was a 90 minute statement, and that's, when I say giving credence, I'm suggesting that Mr. Jocks was, in fact, articulating lots of concern about this dangerous fellow, Mr. Peterson, and the police are listening and trying to locate this individual. So I, I, Your Honor, I understand the premise, but that's not the test of, that would be shifting the standard from the, permeate the entire trial to any time there's a slip-up, we're gonna have to reverse the, the jury's verdict if we, if we go down that road. Well, let me ask you this, if we thought that a prosecutor had intentionally made improper remarks, calculatedly, or however we decided to frame it, would there be some other, other remedy available to us, other than necessarily setting aside the verdict, if we could not convince ourselves that it affected the defendant's substantial rights? Well, I, I do think that just the, the finding itself does have import, Your Honor. I think that making that finding in a Eleventh Circuit opinion is something that is substantial and, and does have a consequent in and of itself, and then within the course of a trial, there could be objections and there could be instructions to the jury. In this case, I think that it's probative that the defense counsel didn't make an objection when the statement was made, and he, and I think what, what that context may have been more clear. Well, an objection might have made it even more prejudicial because defense counsel might have concluded that it would, you know, emphasize the matter to the jury, right? You know, and. There could be strategic reasons for not objecting, Your Honor, but I'd submit in this case that when you look at the factors for determining whether the improper, if, if you assume it's improper, whether it influenced the, the, and permeated the I would like to shift to the spoliation argument if I could. I'd also submit that this isn't a case for the, I know that Bashir case is controlling with regard to the civil context, but there's an important procedural point that wasn't mentioned by Ms. Hayes, which is the defense throughout the pendency of the entire proceedings had never requested that that evidence be tested, and so spoliation isn't designed to be a sword where if somebody wants, waits and sees what happens with certain evidence, and then if it's somehow not available at trial, they then request a jury instruction. It's designed to restore or remedy misconduct on the part of the, the, the party that possesses the evidence. Here the government did possess the evidence, the gunshot residue test and the DNA kit. I was put on the case in early October, and by, from the time I was put on the case, I requested the gunshot residue test be tested. I never made a request with regard to the DNA. There was a confession, as Your Honor noted, and also there wasn't going to be sufficient time for the current trial setting. The defense never made a request, and the defense never moved to continue for what they now call necessary evidence, and instead they waited for, to go to trial with no, with evidence not existing, and so there's no way to show prejudice because all it is, it's an untested gunshot residue kit and an untested DNA kit. It has potential, and I think Judge Huck properly noted that the potential could inculpate, and to some extent, although wouldn't be fully, it could also serve to exculpate Mr. Jacques. It wouldn't be a full exculpation because somebody else's DNA could be on a weapon, but he still admitted to possessing it, and he's not challenging the sufficiency of the evidence there, and so the fact is that in this case, it's a little cynical to ask for an instruction when they never requested the evidence, and that's a pretty big distinguishing factor from the cases they cite in their briefs. For instance, the Sevilla case in the Ninth Circuit where there was a compartment in the vehicle, and they asked to review within five days of the arrest of the defendant. They sent a preservation request. Subsequently, after the preservation request, they put in motions to preserve the evidence. There were two of those motions. Then the judge ordered the government orally and then in writing to preserve the evidence, and still the court found that when that vehicle was sold at auction after forfeiture and not available for the defense, that having been put on notice five times that that was believed to be evidence material for the defendant, then the court found that an instruction was appropriate. We don't have any of that posture in this case. Therefore, it's a little cynical to request that under these circumstances. As the courts have noted, there's no requirement for particular investigative techniques to be done, and if the defendant believed it was material to his defense, he should have made that request. Lastly, I'd like to address the sufficiency of the evidence, and I believe Judge Wilson's initial colloquy with Ms. Hayes aptly sums up the point here, that there was additional and substantial circumstantial evidence of his statement, which that was direct evidence, and then the fact that it was found in the same compartment, in the same trunk, that he's not challenging the sufficiency of the evidence for the firearm that's found in a different compartment, and then in the middle of the trunk is his sweater. So Ms. Fenore, his girlfriend, testified at the trial, and she said that he was in that trunk shortly before they were pulled over, and that he put his sweater in the middle of the trunk. Then there's a gun on the right side of the trunk, and then the jury could reasonably infer, and he references the amount of drugs, the 175, which again, Judge Huck, in the Rule 29, he said any reading that it wasn't referring to the quantity of drugs was strained. Well, that recorded statement is the strongest evidence against him, but it was in English, and he speaks Creole, and he asked for a Creole interpreter, and so how do we factor that into our consideration of the case? I think it was factored in by the jury, and the arguments were made. There was substantial cross-examination on those points, but Judge Middlebrooks, in considering the motion to suppress, stated that Mr. Jocks understood what was occurring, that in his order, that's at docket entry 21, that the officer strained to understand Mr. Jocks at times, but that he understood what was occurring, and I think that when you look at what the defense is asking, they're not raising a Miranda challenge or a challenge to the confession. They're raising a sufficiency challenge, and they're turning its standard on its head. The idea is draw reasonable inferences away from the government and ignore the confession, and that's not what is before the court in a sufficiency review, and so in light of the fact that what's before the court is the need to view all reasonable inferences in favor of the government, Ms. Fenora's testimony that Mr. Jocks was in that trunk shortly before he was pulled over, the fact that the gun was found in one secreted compartment of the trunk, and he referred to the type of drugs, that it was a bomb, that was a term that he introduced to that conversation. Now, there had been questioning regarding drugs, but he's the one who referred to a bomb, the idea of several different drugs packaged within one container, and the fact that he referred to the amount, the number, and now they're asking you to consider maybe it's 100 comma 75, and I'd submit to you that that's an argument they can make to the jury, but it's similar to somebody saying 23 or 23. It doesn't mean that they're saying it's 20. No, it's three. They're saying the number 23, and that's what the transcript, and they didn't even argue that point to the jury because it wouldn't have been a reasonable one for them to make. It was 175 weed that Mr. Jocks said, and so I think now they're trying to suggest that you should draw that inference away from the government, which is not the appropriate standard of review. The last thing I'd like to mention, because it was touched upon briefly, is the lay testimony. Officer Phillipe and Mr. Jocks spoke during the course of that interrogation, as did the other special agents, and Officer Phillipe was a participant in the conversation, and this court has long held that participants of conversation can fill in gaps when, and again we're not filling in a gap as much as explaining his understanding of the conversation, and when there's pronouns that are referenced long ago in the statement, and here what was the judge rule that we had to introduce at Mr. Jocks' request, the entire 90-minute transcript rather than play select excerpts, and so we briefly highlighted a few of the pertinent portions so that the whole thing would not get washed out in presentation to a jury, and Officer Phillipe was able to rationally base his perceptions on being an experienced narcotics officer, a 25-year law enforcement officer, seven years in narcotics, and being a participant in that conversation, which was audio recorded, and he was there live in person, and so his testimony was proper, and it added to the jury's understanding of the case. Unless there are any further questions, I just rely on the briefs and requests that you affirm the court below. All right, thank you Mr. Kobrynsky, and Ms. Hayes, you've reserved some time for rebuttal. Yes, Your Honor, regarding the police arrest criminals statement, I would note that this is a fairly short trial, three-day trial, half of it consumed with that statement, roughly I would say a good portion of it was consumed with that playing of that statement, so it's a short trial that we're talking about. The reliance on that statement renders the evidence less than substantial, so this is a real opportunity for prejudice through a misstatement and closing argument. Also, I'm sorry. It was such a problematic statement, yes, and I'm not defending the statement because I do think it was improper, but if it was so problematic, why did you not, why did the defendant not at least raise something to the court even after closing arguments were made to try to preserve the issue? Why is it the first that we hear of it is on this appeal? I could only speculate about that, Your Honor. I don't know why that was not raised in a timely manner, but I do want to again point out, and the court's aware of this, that a prosecutor cannot call defendant a defendant. Courts have repeatedly chastised courts for suggesting that the government only prosecutes guilty people. The prosecutor, through his statement, intentionally or not, I won't say it was intentional, but suggested the police officers are infallible, and he articulated, the jury certainly could have construed his statement as articulating his belief in the defendant's guilt based on the infallibility of police officers and the fact that only guilty people are an incredibly prejudicial statement in this case. In terms of another remedy, the development of law to help other defendants isn't what we're here for. We're here because Mr. Jacques is serving a 10-year sentence and it was obtained in an unfair trial. Well, let me ask it to you this way. I agree with you that if Mr. Jacques' rights were substantially impaired, then this would need to be set aside. There's no question about that in my mind, but I'm not sure that they were, but that doesn't mean that in an appropriate case where the defendant's rights are not substantially impaired, that a prosecutor can't be sanctioned in some way in order to make it less tempting for prosecutors in the future to engage in that kind of misconduct. Would you agree with that? Understood. But of course, I want Mr. Jacques to have justice and so that's my focus here too. I understand. I want everybody to have a fair trial, but particularly in this event, Mr. Jacques. Regarding the spoliation, it's true that the defense never requested that evidence, but I would like to point out how things usually happen in criminal cases. The government collects evidence. They test their evidence. Often you go to trial and you don't know what's going to be offered. It would be unexpected to have the government have this evidence and never test it and present it. It was a surprising event to find out that the evidence had been destroyed. And yes, it was too late at that point to make the request. Well, except that it's between the state and the federal government and I think sometimes the state handles evidence a little bit differently than the federal government because of the sheer volume of cases that it has, so I'm not making excuses for it. It shouldn't have happened, but I'm not sure I agree with your statement that there would be no reason for them to have it if they weren't going to test it since it was being held by the state and this was being prosecuted by the federal government. I understand, Your Honor, but I do want to point out again that the federal government was involved in this case from the very day of Mr. Jacques's arrest. They were not sitting back on the sidelines in this case. They were always involved in considering whether this case would be prosecuted. And finally, I want to go back to the language. Well, it looks like my time is up, but I do want to stress the language problems that Mr. Jacques suffered. The fact that a clerk of the court decided on his own prerogative that he needed to have a translator at every session and that Agent Philippe explained that he didn't translate things during the course of the interrogation because he didn't want to substitute his own words for his, and yet that's exactly what happened at trial. So, Your Honor, I would ask that the court reverse Mr. Jacques's convictions. Thank you.